ENCYCLOPAEDIA BRITANNICA EDUCATIONAL CORPORATION, Learning Corporation of America, and Time-Life Films, Inc., Plaintiffs,

v.

C. N. CROOKS, Joseph S. Plesur, William Moorman, George Mueller, Richard E. Forrestel, Richard M. Pfeiffer, Frederic Sievenpiper, John Stovall, Theodore H. Ertel, Alvin J. Kraebel, and Board of Cooperative Educational Services, First Supervisory District, Erie County, Defendants.

No. Civ–77–560.

United States District Court,
W. D. New York.

June 21, 1982.

Raichle, Banning, Weiss & Halpern, Buffalo, N.Y. (R. William Stephens, Buffalo, N.Y., of counsel), and Sargoy, Stein & Hanft, New York City (Burton H. Hanft, and Jeffrey A. Rosen, New York City, of counsel), for plaintiffs.

Ellis, Kustell & Mullenhoff, Buffalo, N.Y. (Carl B. Kustell, Buffalo, N.Y., of counsel), for defendants.

CURTIN, Chief Judge.

This is a copyright infringement action which poses the question of whether an educational cooperative's large-scale videotape reproduction of copyrighted works originally broadcast and taken from the television airways constitutes fair use under the copyright laws.

Plaintiffs are three profit motivated corporations engaged in the business of producing, acquiring, and licensing educational audiovisual materials. In this case, they are all primarily involved in the production and distribution of educational works which are marketed to educational institutions, related organizations, and television networks. These works are sold or licensed in several different formats, but in general terms, they may be marketed as 16 millimeter motion pictures (print films) or on various sizes of videotape.

The plaintiffs' primary allegations are that defendants videotaped their copyrighted works from the television airways, principally from the local educational and instructional television station, WNED–Channel 17, maintained a library of these videotaped works, and made copies of these tapes for classroom use. They have selected 19 films which were broadcast over the television airways and videotaped by the defendants as the basis for this action. Each of the plaintiffs owns copyrights to some of these 19 works, and they seek permanent injunctive relief, statutory damages, costs, and attorneys' fees for the defendants' alleged unauthorized use of these works.

Defendants are the Board of Educational Services, First Supervisory District, Erie County, New York [BOCES], and its individual officers and directors. BOCES was created under section 1950 of the New York Education Law for the purpose of providing educational services and specialized instruction on a cooperative basis to the 19 school districts within its geographic region.[1] It is a non-profit organization funded by the 19 school districts, and there are over 100 affiliated schools served by BOCES programs. The purpose of the BOCES cooperative is to provide a variety of educational services in a more economical and efficient form than could be accomplished by an individual school or school district. At the same time, a school district's membership in BOCES does not necessarily mean subscription to or participation in all BOCES educational services.

Two services provided by BOCES are a videotape library and duplication program and a film print library which circulates motion pictures on request to the member schools. When this suit was commenced, 15 of the 21 school districts subscribed to the BOCES Videotape Service, and 20 of the 21 school districts participated in the BOCES Film Service. It should be noted that none of the individual schools or school districts is a party to this action.

The complaint was filed in October of 1977. At that time, plaintiffs were granted a temporary restraining order to prevent destruction of existing videotapes and relevant written records pending a final decision in this case. They were also given leave to conduct accelerated discovery. Subsequently, plaintiffs moved for a preliminary injunction. A hearing was held on December 27, 1977, and a decision was issued granting a preliminary injunction on February 27, 1978. *Encyclopaedia Britannica v. Crooks*, 447 F.Supp. 243 (W.D.N.Y. 1978). The primary basis for that injunction was that BOCES operated a highly organized and systematic program for reproducing videotapes on a massive scale, apparently in blatant violation of the then-existing Copyrights Act. The court subsequently issued an order enjoining BOCES from videotaping plaintiffs' programs off the public airwaves. For the existing videotape library, however, the court declined to enjoin further distribution of these tapes. Rather, it was concluded that plaintiffs would be adequately protected if BOCES monitored the use of the tapes and required their return and erasure within a specified time.[2]

A two-week non-jury trial on the merits was held in the fall of 1980, at which some 17 witnesses testified and 87 exhibits were entered into evidence.[3] Although the trial concerned only the use of 19 works copyrighted by the plaintiffs, limited evidence concerning 126 other copyrighted works owned by the plaintiffs and videotaped by the defendants was permitted to show the defendants' general plan or scheme. Additionally, evidence concerning alternative methods of licensing videotape reproductions was permitted for the limited purpose of demonstrating some harm to the plaintiffs' potential market for or value of the 19 copyrighted works.

Corporate representatives of the plaintiffs, Rolf Rasmussen, Encyclopaedia Britannica Educational Cooperation's [EBEC] marketing manager for television sales; Ralph Wagner, president of EBEC; David Davidsen, former executive vice president of the Learning Corporation of America [LCA]; William Deneen, president of LCA;

1. Originally, there were 21 districts participating in Erie BOCES I. A number of these districts have since been combined with the result that there are now only 19 districts but approximately the same absolute number of schools.

2. The court has been advised that, rather than proceed at its peril, BOCES has discontinued its videotape library services, at least until this lawsuit is concluded.

3. Two additional witnesses, William Fagen, LCA's manager of Educational Television Sales, and Joseph Hamilton, a retired BOCES Videotape Service employee, died before trial. The testimony taken at their depositions was admitted into evidence and made a part of the trial record.

and William Ambrose, vice president of Time-Life, Inc., for marketing in the areas of business and education, testified about the production, distribution, and marketing of their educational films and the effect of unauthorized videotape reproduction on the sales of their companies.

BOCES employees and defendants Dr. Clifford Crooks, the district supervisor of BOCES; Joseph Plesur, formerly the BOCES coordinator of planning and instructional services from 1966 to 1978; Theodore Ertel, BOCES senior educational television equipment specialist; and Alvin Kraebel, supervisor of instructional television operations, testified about the BOCES videotape operations and the duplication and distribution of videotape copies to the schools for classroom use.[4] John Johnston and Charles Teague, two teachers at schools subscribing to the Videotape Service, explained the attributes and mechanics of educational videotape use in classroom instruction.

Raymond Graf, Chief of the New York State Bureau of Educational Communications, testified concerning the history, growth, and development of videotape as a teaching tool, the support of this technological development given by the State, and the value of educational videotapes in classroom instruction. Anthony Buttino, director of educational services at WNED–Channel 17, explained the relationship between BOCES and the station's broadcast of instructional television programs. Additionally, he testified about the various videotape duplication rights granted by copyright holders of educational films.

Norman Johnson, a BOCES employee who is the supervisor of the BOCES print-film library and Service and who now holds Mr. Plesur's position, explained the operation of this program and the division and distinctions between Print Film Service and Videotape Service. Kenneth Wasmund, chairperson of the Appalachian BOCES consortium, testified about the operation of their videotape reproduction and film distribution services. Finally, Dr. Jacky Knopp, a professor of marketing and the defendants' expert witness, testified on the issue of harm and potential harm to the plaintiffs' copyrighted works caused by the defendants' videotape reproduction efforts.

This action was initiated before January 1, 1978, and therefore, the Copyrights Act of 1909 [the Old Act], 17 U.S.C. § 1 et seq., is applicable to all the defendants' activities prior to this date. Concerning any activities of the defendants which occurred after January 1, 1978, or any future activities of the defendants, this case is governed by the Copyrights Act of 1976 [the New Act], 17 U.S.C. § 101 et seq.

## FACTS

The facts are not substantially in dispute. In accordance with Rule 52 of the Federal Rules of Civil Procedure, they are set forth below. At the outset, however, it is helpful to define some of the terms and functions involved in television broadcasting, film production, videotape reproduction, and audiovisual technology.

*Formats*

Traditionally, the most common format for an educational audiovisual work has been the 16 millimeter print film format. The primary advantage of using the print film format is general familiarity with the technology and the availability in the schools of projection equipment.

Videotape is a more recent development, and there are three types of videotape: one-half-inch Sony Betamax, one-half-inch VHS, and three-quarter-inch videotape. These three types of videotape are not interchangeable, and the price of equipment utilizing a specific type of tape varies as well. For example, the court was given to understand that a one-half-inch videotape recorder-player costs approximately $600, while a recorder-player for three-quarter-inch tape costs approximately $1,500.

---

4. Defendant George Mueller was the president of BOCES, defendant William Moorman the vice president, and defendants Richard Forrestel, Richard Pfeiffer, Frederic Sievenpiper, and John Stovall were members of the BOCES Board of Directors in 1974, 1975, and 1976. These individual defendants were not called as witnesses at trial.

Off-the-air recording or videotaping, sometimes called off-air recording, has now almost become a term of art. It refers to the use of videotape in a recorder to record television signals using the videotape in a playback machine or a recorder equipped with the requisite playback equipment. In this manner, television programs originally broadcast over the airways may be transcribed on videotape and then used and replayed much like the more customary audio/tape recorder. Although the means to videotape off-the-air has existed for many years, prior to the marketing of recorder-players such as the Sony Betamax, off-the-air videotaping was a complicated procedure and not as widely used. Recent technological developments have both simplified the use of videotape in cassette or disc form and have added complex electronic capabilities to videotape recorders.[5]

One of the advantages of videotape is that it can be erased and reused extensively. Additionally, unlike print films which may chemically deteriorate over time, videotape has an unlimited shelf life and is less likely to be damaged in use. Further, television programs can now be videotaped with relative ease, and videotape copies made from the original tape can be reproduced with the proper equipment.

A third format by which audiovisual programs are made available to the schools is through the medium of educational television itself.[6] There are two varieties. Most familiar is the daytime instructional broadcast of public television. Less widespread is closed circuit cable and/or microwave transmission within a given broadcast system. The advantage of the latter format in a school setting is that the timing of a program's showing can be at the convenience of the classroom audience. On the other hand, public television has the advantage of reaching a much wider audience without the need for any special transmission and receiving equipment and without the additional equipment operating costs.

### BOCES Print Film Service

Although the BOCES Print Film Service and the Television and Videotape Service are located in the same building in Lancaster, New York, they are administered separately. They are operated by two different staffs in different parts of the building and under different policies. The Print Film Service is supervised by Norman Johnson and consists primarily of a print film library which has extensive holdings totaling over 10,000 print films. In fact, of the 19 works in suit, 16 were purchased by BOCES from the plaintiffs in the form of print films prior to the initiation of this action. At least one of these films was obtained after there were videotapes made of the same work by off-the-air recording. Since the print film staff operated so autonomously from the Videotape Service, the Film Service was unaware that this same work had been copied by the Videotape Service.

The Film Service has two basic methods for determining which films should be acquired for the library. New print films are selected for acquisition by a User Committee. Additional copies of films are purchased when it becomes difficult to fulfill requests for a particular film with a single print. As a general rule, every time there are 30 requests from teachers for a given film, an additional copy is purchased. These purchases are regularly made by BOCES directly from the plaintiffs and other film manufacturers and distributors, and the 1975–1976 budget of the Film Service was approximately $238,000.

BOCES also has the capability to transfer the images on print film to videotape, using two types of "film chain" machinery. Nevertheless, BOCES insists that at no time have the print films involved in this action ever been converted to videotape.

---

5. *See Universal City Studios v. Sony Corporation of America*, 480 F.Supp. 429, at 435–36 (C.D.Cal.1979), which outlines the particular electronic components necessary for off-the-air recording as well as the growth and development of machines which perform this function.

6. Technically, television is not a separate format at all. It is a combination of technologies, which includes the transmission of programs broadcast from a television station studio.

*BOCES Videotape and Instructional Television Service*

The Videotape and Instructional Television Service has extensive facilities for off-the-air recording of television programs, equipment for the simultaneous reproduction of multiple videotape copies of programs, cable television, and microwave transmitting and receiving equipment licensed by the Federal Communications Commission, as well as a videotape library. The value of the electronic equipment used by BOCES ranges from $500,000 to $1,000,000, and the library contained 4,500 videotaped programs during the 1976–1977 school year. Most of these library holdings were obtained by the off-the-air recording of programs broadcast by television stations. The sophisticated electronic equipment used by the BOCES staff can produce 60 videotape copies of any given program in a 24-hour period. Additionally, BOCES has a 100-foot antenna tower for receiving television signals and two microwave antennas for broadcasting its own signals to member schools.

The BOCES Videotape and Television Service has approximately nine employees and a budget of some $297,000 per school year, as reported in 1976–1977. These funds were primarily derived from the 15 participating school districts, based upon a per-pupil assessment for each school district.

BOCES originally began videotaping television programs in 1966 when defendant Joseph Plesur was hired by BOCES to establish an instructional television service for the schools in the BOCES district. Since that time, the Videotape Service has grown at a rapid rate, and the videotape library has become the largest in the State. According to the BOCES 1976–1977 budget, some 14,000 programs were either transmitted to schools via cable television or were reproduced on school-owned videotape during the prior year.

Since 1967, the BOCES supervisor of instructional television has been defendant Alvin Kraebel, who was hired by Plesur. It was under Kraebel's supervision, but at Plesur's direction, that BOCES generally videotaped all programs broadcast by WNED during the instructional daytime television period. This period of time, between 9 a. m. and 3 p. m., is traditionally reserved for school-related instructional programs broadcast by instructional television stations. During this six-hour period, BOCES usually videotaped all programs broadcast by WNED and 17 of the 19 works in issue here.

Defendants concede that BOCES videotaped off-the-air all programs of educational value. They presumed that if a program was broadcast by WNED as part of the station's daytime instructional television broadcasts, the program had inherent educational value. Additionally, BOCES videotaped television programs of educational value broadcast by three of the local Buffalo commercial television stations, evening programs broadcast by WNED, and programs from a not too distant Canadian educational television station. In this case, 2 of the 19 films in suit were originally broadcast as part of the evening television programming.

Defendants videotaped entire programs, including plaintiffs' copyrighted notices from the various television stations' broadcasts. They have conceded that there was no prior permission secured from the plaintiffs or any fees paid to the plaintiffs for BOCES' videotape copying. Further, BOCES had no contractual relationship with the plaintiffs or with WNED for the purchase or licensing of the off-the-air videotapes derived from the television broadcasts.

*Videotape Service Operations*

The production and distribution operations of the Videotape Service are significant to many of the legal issues in this litigation and will be described in some detail. The holdings in the videotape library were made known to teachers in the BOCES district by means of a catalog which was periodically supplemented or revised. Approximately 4,000 copies of the 1975–1976 catalog were distributed, and this edition listed some 5,000 "master" vi-

deotapes [7] in a 345-page directory, divided into 26 separate subject areas. Each of the plaintiffs' 19 copyrighted works involved in this lawsuit has been listed in one of the BOCES catalogs as available to schools; however, none of these catalogs was ever sent to the plaintiffs.

Every videotape in the BOCES library and catalog was assigned an accession number, and each catalog contained written request forms. When a teacher from a subscribing district wanted to use a videotaped program from the BOCES library, the teacher would complete the form and have it sent to the Videotape Service. In response to the request, the Service would copy the requested program onto videotape from the master videotape kept in the BOCES library. The videotape used for making the copy was usually supplied by the school, although occasionally, the copy tape was supplied by the Service.

The videotape copy was then returned to the school, usually within seven days of the request, where it was often screened by the requesting teachers to determine whether the program was suitable for students and the curriculum. If the videotape copy was used by the teacher, testimony by teachers at trial revealed that the copy was generally shown five or six times so that several class sections would view the program. These repeated showings of off-the-air videotaped programs, which had earlier appeared on television, permitted the defendants to engage in what they call "time-shifting."

In home videotape recording and playback systems, time-shifting refers to the ability of some videotape machines to record television programs while the viewer is watching another station or program, or even when the viewer is not watching television at all. The videotape machine can be programmed in advance to receive and record television broadcast signals at a particular time and then played back at the viewer's convenience. *See Universal City Studi-*

os, Inc. v. Sony Corporation of America, 480 F.Supp. 429, 435 (C.D.Cal.1979). In this case, time-shifting refers to the ability of teachers and students to view instructional television programs by BOCES' off-the-air recording, irrespective of when the program was broadcast by WNED. In essence, time-shifting provides for a more flexible television viewing schedule through videotape transcription and later playback for the convenience of the teachers and students.

The Videotape Service kept no records concerning the use of the videotape copies after they were delivered to the schools. There were no restrictions or requirements imposed by BOCES on the use of these copies; they could be kept by the school, or the copies could be returned to the Videotape Service for erasure and used again for duplication. Some schools kept the copies and created their own libraries of videotape programs, with collections of up to 100 tapes, but the more common practice was to use the same tape repeatedly for copying different programs.

The Videotape Service occasionally made videotape copies for institutions not affiliated with BOCES. These copies were made either free of charge or at nominal cost— such as $25 per hour of duplicating, with the organization supplying the videotape for the copy. Organizations whose requests were filled in this manner included the State University College at Buffalo, other BOCES, the Buffalo public schools, as well as at least one profit-making, non-educational corporation. The extent of this practice was only a small part of the Videotape Service's overall work. Of the 16,730 "usages" of the Videotape Service in a two-year period, only 198 were of this sort. In addition, no evidence was adduced at trial that any of the 19 works in suit were copied at the request of these non-BOCES organizations.

*WNED and Instructional Television Programming*

WNED is the local Western New York public television station which also func-

---

7. Some programs which were copied required more than one videotape "reel" to tape the entire program. Each videotape was assigned an accession number, and as a result, the catalog listed approximately 4,500 titles contained on 5,000 videotapes.

tions as an instructional television station. As an instructional television station, it is considered a regional education agency and is chartered by the New York State Board of Regents. Since 1960, the station has been broadcasting instructional daytime television programming, and since 1972 when State law was changed, the cost of this broadcasting has been almost totally funded by the State. Under this arrangement, WNED receives approximately $180,000 annually from the State for instructional television broadcasting purposes. Prior to this time, a large portion of WNED's instructional television budget was derived from schools, school districts, and BOCES.

A substantial number of programs broadcast by WNED are supplied to the station by the Eastern Education Network. Each year, member stations of this network, including WNED, designate representatives to attend meetings where network-wide programming decisions and selections are made. These program selections are in turn broadcast by WNED during "preview week" and evaluated by teachers and BOCES representatives who serve on the Western New York Public Television Council. Based upon these evaluations, the final program selections are made for broadcast by the television station. In the past, these selections have included copyrighted works of the plaintiffs.

The fees for licensing these broadcasts vary with the copyright holder and individual work as well as the number of times a program may be rebroadcast by the station. Generally, plaintiffs Encyclopaedia Britannica and LCA received between $55 and $75 from the Eastern Educational Network for every instructional television station which would broadcast their individual films. Time-Life's broadcast license fee for each work ranged between $250 and $400 per television station. Individual stations may also contract directly with audiovisual producers and distributors for the television rights to broadcast their media works.

Beginning in 1975, WNED began circulating information to schools about the off-the-air copying rights granted by some of the copyright holders of instructional television programs broadcast by the station. These rerecord rights, as they are called, vary greatly; some copyright holders permit broad reproduction of their works, while others place restrictions to prohibit rerecording altogether. Anthony Buttino, director of Educational Services at WNED and supervisor of the daytime instructional broadcasting for the station, explained at trial that the Advisory Council now attempts to select only programs which offer rerecord rights. Prior to the introduction of State funding, WNED's contract with schools for instructional television broadcasts would also list some of the off-the-air rerecording rights for the works televised by the station. None of the films in this case was listed in the contract as available for off-the-air recording.

Additionally, WNED publishes an annual program guide of its instructional television programs which is distributed to teachers. This guide explains how to use the program in classroom learning, the purpose of the work, and suggested follow-up activities to be undertaken by students based upon their viewing of the program. It should also be noted that WNED is not a party to this action.

*Production and Distribution of Educational Films and Videotape*

Plaintiff Encyclopaedia Britannica Corporation began producing and distributing films in 1929. The Corporation both produces and contracts with others to produce non-theatrical print films, and it has approximately 1,500 active titles available for classroom use. These works may be purchased outright or over a period of time, rented for a short duration, or leased for 12 months or longer. Encyclopaedia Britannica produces approximately 70 new films a year, at an estimated average cost of $66,000 per 30-minute film. The market price for each work varies, but they are generally sold for several hundred dollars in film format. About 5 percent of Encyclopaedia's revenue is derived from the television broadcast of their works, and in this case,

Encyclopaedia Britannica holds the copyrights of 7 of the 19 works in issue.[8]

In response to the development in late 1973 of the simplified videotape recorder-player such as the Sony Betamax, Encyclopaedia Britannica began offering its film works in video cassette and video disc formats. EBEC also offers a licensing agreement which permits the videotape reproduction of their copyrighted films by those already owning the work in film format. This license is based upon a rate of $5 for the first 10 minutes of film running time and $3 per minute for the remaining length of the film. Thus, the license fee for those owning their own videotape equipment and transferring film images to videotape is $110 for a 30-minute Encyclopaedia Britannica film. This license provides for only one videotape copy at any one time, although the single copy may be erased and later reproduced again at the owner's convenience. If more than one copy is desired, additional licenses must be purchased from Encyclopaedia Britannica for each copy.

Another agreement developed by Encyclopaedia Britannica allows an educational institution to make unlimited videotape copies of any Encyclopaedia Britannica film already owned by the institution. The fee for this license is based upon the number of playback machines used to show the videotape copies, and the license fee per machine decreases in proportion to the additional number of playback machines authorized to show the copies. Under this scheme, one Encyclopaedia Britannica playback machine license costs $125. If 250 playback machines are licensed, the individual machine license fee decreases to $48 per machine. This licensing agreement between Encyclopaedia Britannica and the educational entity also requires that the videotape copies produced under the contract be erased or destroyed at the expiration of the agreement if it is not renewed by the parties.

Appalachian BOCES, which geographically adjoins the defendant BOCES, has entered into this type of licensing agreement with Encyclopaedia Britannica. It has also entered into a similar arrangement with plaintiff LCA for the videotape reproduction of their film works. Appalachian BOCES' total cost for both these licensing agreements is $75,000 for a five-year period of time, and since 1974, Encyclopaedia Britannica has derived approximately $685,000 from this type of agreement with educational institutions.

Encyclopaedia Britannica has also entered into licensing agreements with television stations and schools, which permit the schools to make off-the-air recordings and videotape copies of Encyclopaedia Britannica works broadcast by an educational television station. Such an agreement exists between EBEC, the schools, and Channel 19 in Kansas City.

Finally, Encyclopaedia Britannica allows schools to make off-the-air recordings from instructional television broadcasts of their works, and these videotape copies may be used for seven days. This off-the-air copying does not require the payment of any fees, although Encyclopaedia Britannica requests that the educational institutions limit their videotaping to one copy per school and that they notify EBEC of their videotape copying. After this seven-day period, the copies are to be erased.

Plaintiff Learning Corporation of America was originally known as the Learning Company of America when it began in 1968 as a division of Columbia Pictures. The company was sold to the W. F. Hall Printing Company in 1974, and its name was changed to reflect this new corporate ownership. All of the 10 LCA films involved in this suit were originally registered under the copyright statutes by the Learning Corporation of America, and the copyright

---

**8.** Encyclopaedia Britannica Educational Corporation owns the copyrights to the following films in issue here:

"Bartleby"
"My Old Man"

"The Lady or The Tiger"
"The Crocodile"
"The Lottery"
"The Secret Sharer"
"Dr. Heidegger's Experiment"

ownership for each of these films has since been assigned to LCA.[9]

LCA produces and distributes some 500 non-theatrical films primarily to educational institutions. The purchase price for these films ranges from $225 to $380 each, and the cost for producing these works is estimated to be between $85,000 and $95,-000 per film. William Deneen, the president of LCA, testified that they must sell 500 copies of a given film before any profits are generated for the corporation.

LCA's videotape licensing agreement for videotape reproduction of films already owned by a school is based upon a fee of $3 per minute of running film time. Thus, a 30-minute LCA film may be reproduced onto videotape under license for $90. As with plaintiff EBEC, additional videotape copies require additional licenses from the corporation. LCA also has a more flexible videotape licensing agreement, such as the agreement between LCA and Appalachian BOCES.

Before 1978, LCA had a policy similar to EBEC's which allowed schools to make off-the-air videotape reproductions of their works broadcast by instructional television stations. This policy permitted schools to make copies of the broadcasted works without charge, and the videotape copies could be used for up to seven days, after which they were to be erased. As the use of off-the-air videotape recording expanded in the mid-1970s, schools began to request use beyond the seven-day period, and LCA also noted a decline in their film sales.

In January of 1978, based upon declining film sales which LCA believes were caused by extended and expanded off-the-air videotaping by educational institutions, LCA decided to no longer offer their works for broadcast by education television networks. This resulted in a loss of some $400,000 in revenue to the corporation for educational

television broadcast sales; however, LCA believes that its film and videotape sales will ultimately increase as a result of their withdrawal from the educational television market. Prior to this decision, educational television broadcasting sales comprised only 1.5–2 percent of LCA's total revenues, and they continue to sell their works for broadcast by commercial television networks.

Plaintiff Time-Life produces some films for educational use, but the majority of films which the company distributes are produced by the British Broadcasting Corporation or are jointly produced with the BBC. In this suit, the two works to which Time-Life holds the copyrights were originally broadcast outside of the instructional broadcast period. "The Ultimate Risk" was originally broadcast by WGR–Channel 2, a local commercial station, as part of the station's evening programming, and the other, "The Ultimate Machine," was broadcast during the evening hours by WNED.

Time-Life sells its works in both film and videotape formats to educational institutions. Although the corporation prefers to make videotape copies of its works to ensure the quality of the reproduction, it does license videotape copying if the quality can be maintained by those producing the copies. Time-Life's fee for their videotape copying licenses varies with the number of videotape copies made and the average daily attendance at an educational institution.

## LEGAL CONTENTIONS

Plaintiffs' argument is essentially unchanged from that presented at the time of the preliminary injunction decision. As the copyright owners of the films in question, they claim that they have the exclusive rights under the federal copyright laws to control the copying and use of their works. Plaintiffs claim three separate kinds of

9. Learning Corporation of America owns the copyrights to the following films in issue here:
   "Walter Kerr on Theatre"
   "Opera with Henry Butler"
   "Symphony Sound with Henry Lewis and the Royal Philharmonic"
   "Felipa: North of the Border"

   "Geronimo Jones"
   "Miguel" Up from Puerto Rico"
   "Siu Mei Wong: Who Shall I Be?"
   "Two Deserts: Sahara and Sonora"
   "Two Grasslands: Texas and Iran"
   "Two Mountainlands: Alps and Andes"

copyright infringements for the 19 films in issue here: (1) the making of five original master videotapes [10] and videotape copies derived from all the master tapes in violation of 17 U.S.C. § 1(a); (2) the vending of these copyrighted works by BOCES in violation of 17 U.S.C. § 1(a), based upon contributions from school districts to BOCES for participation in the Videotape Service; and (3) the public performance of these works in the classrooms caused by BOCES' videotape duplication and closed circuit cable television transmission in violation of 17 U.S.C. § 1(d). Thus, each time a videotape was copied and sent out to a school and played in a classroom, plaintiffs claim that at least three infringements of their copyrights occurred under the Old Act.

The defendants' position is in essence that if technological change has rendered the Copyrights Act ambiguous, the Act must be construed in light of its basic purpose, *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975), and that the equitable doctrine of fair use is applicable to the videotaping practices of BOCES brought about by these technological changes. Second, they maintain BOCES was a "transmitting organization" under the Old Act and is a "broadcasting entity" under the New Act, and therefore, its videotaping does not constitute an infringement as a matter of law. Further, the defendants also claim the protection of the First Amendment of the United States Constitution because they are in the business of promoting education, a matter "of paramount interest." Defendants also rely on the doctrine of estoppel. Finally, even if the court finds liability, defendants argue that no injunction may issue, because the claim of future damages is too speculative and that in the interest of justice, only actual, rather than statutory, damages should be awarded.

The resolution of these issues requires a balancing of the need to provide a fair

return for an "author's" creative labor while, on the other hand, stimulating artistic creativity for the general public good. This type of economic analysis, which has long been recognized by the courts as the underpinning of our copyright statutes, guides the court's decision-making at every stage so that we do not lose sight of the overall purpose of the legislative scheme. *See generally Twentieth Century Music Corp. v. Aiken*, 422 U.S. at 156, 95 S.Ct. at 2043 (1975); *Kendall v. Winsor*, 21 How. 322, 328, 16 L.Ed. 165 (1858).

## FAIR USE

This court discussed the doctrine of fair use as applied to BOCES in *Encyclopaedia Britannica v. Crooks*, 447 F.Supp. at 249–52, when the plaintiffs in this case were granted a preliminary injunction. This initial consideration and the application of the doctrine to the issues involved here have essentially been confirmed by the subsequent trial. There have been some additional fact issues raised, however, which the court must now discuss.

As noted in the earlier *BOCES* decision, fair use is a judicially created doctrine. The earliest American report in which the expression "fair use" appears in quotation marks, is *Lawrence v. Dana*, 15 F.Cas. 26, 60 (No. 8136) (C.C.D.Mass.1869). B. Kaplan, *An Unhurried View of Copyright*, at 67 (1966). The doctrine is generally thought to have had its origin in the opinion of Justice Story in *Folsom v. Marsh*, 9 F.Cas. 342 (No. 4901) (C.C.D.Mass.1841). Since that time, fair use has been invoked to protect parody, burlesque, and satire. *See generally Elsmere Music, Inc., v. National Broadcasting Company, Inc.*, 482 F.Supp. 741 (S.D.N.Y.1980), *aff'd* 623 F.2d 252 (2d Cir. 1980); *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964), *cert. denied*, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964); scholarly research and copying, *see generally Williams & Wilkins Co. v. United States*,

10. In some instances, a master videotape was made within three years of the filing of the complaint, and plaintiffs claim that the making of these master tapes constitutes additional acts of copying by the defendants within the three-year statute of limitations prescribed in 17 U.S.C. § 115(b) of the Old Act. *See* discussion, *infra*.

487 F.2d 1345 (1973), *aff'd per curiam by an equally divided court*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966), *cert. denied* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); and when factual information is inextricably related to a film's expression of that information, *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130 (S.D.N.Y.1968). It is also true that in judicial interpretations of the Old Act and under the New Act as well, the doctrine of fair use is more liberally applied in non-commercial and non-profit educational situations. *See, e.g., Williams & Wilkins Co. v. United States, supra; Berlin v. E. C. Publications, supra*; H.R.Rep.No.94–1476, 94th Cong., 2nd Sess., 65–67 (Sept. 3, 1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, 5659 at 5678–80.

A number of principles can be drawn from these and other cases as to what factors constitute fair use. Section 107 of the Copyrights Act of 1976, 17 U.S.C. § 107 which, although not controlling in all instances here, is intended to be a codification of preexisting law, *see MCA, Inc. v. Earl Wilson, Jr.*, 677 F.2d 180, No. 934–35 (2d Cir. July 30, 1981); *Meeropol v. Nizer*, 560 F.2d 1061, 1068 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), and the text of this section is as follows:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

It is clear that these particular factors are illustrative, not exhaustive. 3 Nimmer on Copyrights § 13.05. *See generally* H.R. Rep.No.94–1476, 94th Cong., 2nd Sess., 65–67 (Sept. 3, 1976), *reprinted in* [1976] U.S. Code Cong. & Admin.News, 5659 at 5678–80.

It is also clear that in restating the judicial doctrine of fair use, Congress did not intend "to change, narrow, or enlarge it in any way." *Id.* at 66; 5680. Consequently, what constitutes fair use is primarily a fact question. The admonition of the United States Court of Appeals for the Second Circuit to that effect is well taken:

The line which must be drawn between fair use and copyright infringement depends on an examination of the facts in each case. It cannot be determined by resort to any arbitrary or fixed criteria [citations omitted].

*Meeropol v. Nizer*, 560 F.2d at 1068. On the other hand, as Professor Nimmer has observed, what facts will be sufficient to raise this defense in any given case is not easily answered. 3 Nimmer on Copyrights § 13.-05.

Both parties have sought support from the two *Sony* cases, *Universal City Studios, Inc. v. Sony Corporation of America*, 480 F.Supp. 429 (C.D.Cal.1979), and the subsequent appellate decision, *Universal City Studios, Inc. v. Sony Corporation of America*, 659 F.2d 963 (9th Cir. 1981), which were decided while this matter was *pendente lite.* The *Sony* district court found that private home use of a videotape recorder and off-the-air copying for private, non-commercial use was fair use under the Old and New Copyrights Acts and did not constitute copyright infringement. In that opinion, the district court distinguished this court's preliminary injunction, stating:

Even if that court had made a final determination on infringement, the case nonetheless would be more dissimilar to the situation here than similar. The most important difference is that it did not involve home-use off-the-air recording but rather "a highly organized and systematic program for reproducing videotapes on a massive scale. [Citation omitted.]"

480 F.Supp. at 450.

On appeal, the United States Court of Appeals for the Ninth Circuit reversed the district court's decision, finding that home videotape recording did constitute copyright infringement. 659 F.2d at 969. At the same time, the Court of Appeals' decision was strictly limited to the issues of private home videotaping practices.

Both this case and the conflicting *Sony* decisions evolve from the relationship of the copyright laws to the use of new and similar technologies. Beyond this threshold, however, the similarity ends. The analyses of fair use and the copyright laws in the *Sony* opinions are at times helpful and instructive to the legal issues presented here, but the *Sony* cases are, in comparison to the instant case, "no more like than an apple to an oyster." [11] Of foremost concern here are the copyright laws and their application to off-the-air videotape recordings used for classroom educational use.

## HARM

When examining "the effect of the use upon the potential market for or value of the copyrighted work," or more succinctly, "harm," several commentators and courts have suggested that this factor be considered first in determining fair use. *See Universal City Studios, Inc. v. Sony Corporation of America*, 480 F.Supp. at 450. In analyzing harm or potential harm to the copyright holder, courts have focused on considerations such as whether the defendants' use "tends to diminish or prejudice the potential sale of plaintiff's work," *Meeropol v. Nizer*, 560 F.2d at 1070; *Marvin Worth Productions v. Superior Films Corp.*, 319

F.Supp. 1269, 1274 (S.D.N.Y.1970); or whether the use "has tended to interfere with the marketability of the copyrighted work," *Elsmere Music, Inc. v. National Broadcasting Co.*, 482 F.Supp. at 747; or whether the use has the intent or effect of "fulfilling the demand for the original work," *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Berlin v. E. C. Publications*, 329 F.2d at 545. Similarly, the court in *Universal City Studios, Inc. v. Sony Corporation of America*, 659 F.2d at 974, determined that harm should also be considered by inquiring whether the "*cumulative* effect of mass reproduction of copyrighted works made possible by video recorders" tends to diminish the potential market for the copyright holders' works.

Plaintiffs stress that BOCES' off-the-air videotaping and copying cause harm to the plaintiffs' own market and potential market for videotape sales. Plaintiff Time-Life prefers to duplicate and sell its own videotape copies to schools, and plaintiffs LCA and Encyclopaedia Britannica have entered into various licensing agreements with educational institutions which permit off-the-air videotaping and copying, contingent upon the payment of fees to the plaintiffs. They contend that these types of agreements would become both meaningless and worthless if BOCES can freely videotape and copy their works from the airways.

Clearly, BOCES' videotaping practices interfere with this aspect of the marketability of plaintiffs' copyrighted works; these practices tend to diminish and prejudice the potential sale of plaintiffs' works in videotape format. It is totally unreasonable to expect educational institutions to pay for licensing agreements or videotape copies marketed by the plaintiffs when these same works can be obtained and copied with the proper equipment for nothing. The cumulative effect of BOCES' massive videotape copying indicates that there would be no market whatsoever for plaintiffs' video-

11. Sir Thomas Moore, *English Works*, p. 724 (pub. 1557).

tape sales or licensing agreements if off-the-air videotaping of plaintiffs' works is permitted to continue in an unregulated fashion.

Defendants propose that the court look to their use of the 16 films and their 19 master videotapes and copies rather than the broader videotape market. They argue that plaintiffs have failed to demonstrate that a single film order was lost as a result of BOCES' videotaping activities. At trial, defendants called their marketing expert, Dr. Jacky Knopp, who explained a study he undertook of the plaintiffs' market for the 19 films. This study purportedly demonstrates that as a result of BOCES' videotaping practices, no harm has resulted to plaintiffs' market in the past, nor will any harm be inflicted on plaintiffs' potential future market. Dr. Knopp's determination of this lack of harm was based upon the following considerations: (1) there is no potential for future sales growth of these 19 films; (2) the sale of these 19 works essentially follows a statistically normal "product life cycle" which is now in decline; (3) any decline in the purchase and sale of films was related to declining school enrollment; (4) film sales in other states and the sales records of Encyclopaedia Britannica sales personnel in New York State showed no adverse effect caused by BOCES' videotaping; and (5) an analysis of BOCES' film and videotape requests received from teachers revealed that none of the 19 videotaped works was demanded in sufficient quantity to warrant either BOCES' initial purchase of a work in film format or the additional purchase of a print film copy from the plaintiffs.

Defendants support this last contention by arguing that approximately 30 teacher requests are generally necessary before the Film Service would normally order an additional copy of print film. Concerning the 16 films which BOCES already owned, defendants combine the total annual number of film and videotape teacher requests received by the two independent media services for each work. This combined number of teacher requests, they contend, does not reveal any need for an additional print film purchase from the plaintiffs. Thus, defendants argue that plaintiffs cannot show any harm in lost film sales caused by BOCES' videotaping activities. For the three works which BOCES did not own in film format, defendants argue that their videotape use was not sufficient to warrant purchase of the films.

Plaintiffs maintain that defendants' entire study is flawed in a number of respects, since it does not take into account lost potential film sales or the effect and use of off-the-air videotaping by educational institutions. Notwithstanding any deficiencies in the study, defendants' contentions are unpersuasive in demonstrating lack of harm to the plaintiffs' copyright, and it is only necessary to focus on BOCES' use of plaintiffs' 19 works to show this harm.[12]

The issue here cannot be framed as to whether the BOCES' teacher request records would demonstrate the requisite BOCES' defined "need" for the Film Service to purchase a film or an additional print from the plaintiffs. The issue here is whether BOCES' off-the-air videotaping and copying cause harm to the plaintiffs. The 19 works videotaped and copied in this case obviously fulfilled a demand for the plaintiffs' works—otherwise they would not

---

**12.** The other considerations presented by the defendants do not adequately address or demonstrate a lack of harm caused by BOCES' videotaping activities to plaintiffs' market for their copyrighted works. Defendants' suggestions concerning sales growth for the 19 works and their product life cycle estimates fail to explain the relationship between BOCES' past videotaping activities and the use of videotape copies to fulfill a demand for plaintiffs' original works. The statistical analysis of correlating declining school enrollment to declining film sales does not take into consideration the intro-duction and use of Betamax-type recorders by BOCES and other educational institutions during the same time period. Further, defendants only presented at trial a state-by-state comparison of plaintiff Encyclopaedia Britannica's film sales in support of their lack of harm arguments. The relationship of the other plaintiffs' film sales to this theory was never explained, and LCA's decision to withdraw from the educational television market due to declining film sales caused by off-the-air videotaping flatly contradicts defendants' lack of harm theory.

have been requested by teachers, copied by the Videotape Service, and distributed to classrooms. Three of these nineteen works, "Siu Mei Wong: Who Shall I Be?," "Miguel: Up from Puerto Rico," and "The Ultimate Risk," were not owned in film format; they were available to teachers only on videotape.[13] In this form, these videotape copies plainly had the effect of fulfilling a demand for the *original* work, *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d at 96, since without the videotape copies, these works would not have been available at all. This use causes harm to the plaintiffs' copyright, for even if the use was insufficient to warrant purchase under BOCES' own standards, defendants could have leased or rented these three works from the plaintiffs for classroom use. Thus, the videotape use here directly interferes with the marketability of plaintiffs' copyrighted works, *Elsmere v. National Broadcasting Co.*, 482 F.Supp. at 747, and the cumulative effect of this videotaping tends to diminish and prejudice the potential market for these works. *Meeropol v. Nizer*, 560 F.2d at 1070; *Universal City Studios, Inc. v. Sony Corporation of America*, 659 F.2d at 974.

Another example of demonstrable harm is BOCES' videotape use of Time-Life's work, "The Ultimate Machine". As ex-plained at trial, the Videotape Service made a master videotape from a television broadcast of this work in 1970, and copies were subsequently requested and circulated to schools. In July, 1974, the Film Service also purchased a print of the work from Time-Life. This decision to purchase the film was apparently made independently of the prior videotape use or without knowledge of the videotape library's existing master copy.

Yet, before the work was purchased by BOCES in film format, the videotape copies clearly fulfilled a demand for the original work, and BOCES' copying practices tended to interfere with the plaintiffs' marketability of the work. Had "The Ultimate Machine" not been available on videotape, teacher requests for purchase of the film might well have been directed to the Film Service at an earlier date. Viewed from a cumulative perspective, this videotaping can only been seen as tending to prejudice the plaintiffs' potential market.

Third, even if the court were to accept the defendants' contention that in order to demonstrate harm, 30 or more combined requests are necessary to show the "need" for an additional purchase of a film print, defendants' own data indicate that this need is well documented.[14] Encyclopedia Britannica's work, "The Lottery," received

13. From 1974 through 1977, LCA's "Miguel: Up from Puerto Rico," was requested seven times in videotape format; "Siu Mei Wong: Who Shall I Be?" was requested once in 1974–1975 and once in 1976–1977; and Time-Life's work, "The Ultimate Risk," was requested once in 1973–1974 and twice in 1974–1975.

14.    TABLE OF BOCES' PRINT FILM SERVICE REQUESTS AND VIDEOTAPE
SERVICE REQUESTS RECEIVED BY THE TWO MEDIA SERVICES
FOR PLAINTIFFS' 19 WORKS
(From Doc. # 148)

ENCYCLOPAEDIA BRITANNICA

|  |  | 1973–4 | 1974–5 | 1975–6 | 1976–7 |
|---|---|---|---|---|---|
| Bartleby | Film | – | 8 | 10 | 14 |
|  | TV Tape | – | – | 5 | 3 |
| Crocodile | Film | – | – | 8 | 6 |
|  | TV Tape | – | – | 1 | 2 |
| Dr. Heidegger | Film | – | 18 | 25 | 26 |
|  | TV Tape | – | – | – | – |
| Lady or Tiger | Film | – | 21 | 30 | 22 |
|  | TV Tape | – | – | 7 | 5 |
| Lottery | Film | – | 34 | 38 | 31 |
|  | TV Tape | – | – | 9 | 12 |
| My Old Man | Film | – | 12 | 15 | 15 |
|  | TV Tape | – | – | 3 | 1 |

47 combined requests in 1975–1976 and 43 combined requests in 1976–1977; "The Lady, Or the Tiger," received 37 combined requests in 1975–1976; LCA's work, "Two Mountainlands: Alps and Andes," received 36 combined requests in 1974–1975, 33 requests in 1975–1976, and 38 requests in 1976–1977; their work, "Geronimo Jones," received 37 combined requests in 1974–1975.[15]

Yet, because the two BOCES Media Services operated independently, this combined usage demand was never considered or accurately reflected in the Film Service's choice of additional print film purchases. Further, unlike BOCES' film prints, there was no requirement that videotape copies ever be returned to the Videotape Service. Teachers could keep and use the videotapes indefinitely. Thus, even these combined re-

| | | | | | |
|---|---|---|---|---|---|
| Secret Sharer | Film | – | – | 16 | 12 |
| | TV Tape | – | – | – | 6 |

| TIME LIFE | | 1973–4 | 1974–5 | 1975–6 | 1976–7 |
|---|---|---|---|---|---|
| Ultimate Machine | Film | – | 12 | 18 | 10 |
| | TV Tape | 1 | 1 | – | – |
| Ultimate Risk | Film | – | – | – | – |
| | TV Tape | 1 | 2 | – | – |

| LEARNING CORPORATION OF AMERICA | | 1973–4 | 1974–5 | 1975–6 | 1976–7 |
|---|---|---|---|---|---|
| Kerr on Theatre | Film | N.A.* | 17 | 13 | 18 |
| | Tape | – | 4 | 1 | 3 |
| Henry Butler | Film | N.A. | 15 | 14 | 16 |
| | Tape | – | 2 | 1 | 0 |
| Symphony Sound | Film | N.A. | 7 | 5 | 10 |
| | Tape | – | 3 | 1 | 0 |
| Felipa | Film | N.A. | 13 | 18 | 8 |
| | Tape | 1 | 3 | 1 | 0 |
| Geronimo Jones | Film | N.A. | 33 | 38 | 28 |
| | Tape | 0 | 4 | 0 | 0 |
| Miguel | Film | – | – | – | – |
| | Tape | 3 | 2 | 1 | 1 |
| Siu Mei Wong | Film | – | – | – | – |
| | Tape | – | 1 | 1 | – |
| Two Deserts | Film | N.A. | 22 | 37 | 27 |
| | Tape | 2 | 5 | 2 | 2 |
| Two Grasslands | Film | N.A. | 20 | 18 | 16 |
| | Tape | 2 | 2 | 1 | 1 |
| Two Mountains | Film | N.A. | 34 | 31 | 37 |
| | Tape | 5 | 2 | 2 | 1 |

* Data Not Available.

15. Dr. Knopp testified at trial that the Print Film Service did purchase an additional print film copy of "Geronimo Jones" and "The Lottery." Nevertheless, the decision to purchase these films did not take into account the videotape requests for these same works or that these film purchase decisions might have been made at an earlier date, had the videotape requests been directed to the Print Film Service. Dr. Knopp also testified that the Print Film Service did not purchase an additional copy of "Two Mountain Streams," although the

quest statistics may not reflect the actual need for additional film print purchases.

Defendants' expert explained at trial that the Film Service policy of purchasing an additional film after 30 teacher requests was only a "rough rule of thumb." Nevertheless, even under this rough rule of thumb standard, it is evident that BOCES' videotape copying tends to interfere with the marketability of plaintiffs' copyrighted works and that videotaping in this instance tends to diminish and prejudice the potential sale of plaintiffs' works.

Defendants also contend that the plaintiffs have failed to suffer harm because each corporation has enjoyed substantial profits during the same years of BOCES' videotaping activities. Plaintiffs, on the other hand, reject this standard as being comparable to the "failing company doctrine" used in the Clayton Act. They contend that under this analysis, the only way harm could be shown would be if the copyright holder was threatened by business failure as a result of fair use.

Defendants did in fact demonstrate at trial that the three plaintiffs turned a profit for the period in question, or at least moved from the red to the black. Nevertheless, the concern here must be focused on a copyrighted work's *potential* market. It is perfectly possible that plaintiffs' profits would have been greater, but for the kind of videotaping in question. In this respect, plaintiff LCA's decision to no longer license its films to educational television networks for broadcast supports this reasoning. As explained at trial, the Corporation decided in early 1978 to forego profits made from educational television broadcast licenses in order to prevent further lost film and videotape sales. These lost sales were believed to be caused by educational institutions' off-the-air videotaping of their works. Thus, regardless of LCA's overall profitability, their profits during the period of BOCES' videotaping may well have increased, but for off-the-air videotape copying.

Defendants' final contention is that if plaintiffs are suffering harm caused by off-the-air videotaping, plaintiffs can increase the licensing fees they charge to educational television stations for the broadcast of their works. Defendants argue that this is an important consideration because "[w]hile securing compensation to the holders of copyrights was an essential purpose of that Act, freezing existing economic arrangements for doing so was not." *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 414 n.15, 94 S.Ct. 1129, 1141 n.15, 39 L.Ed.2d 415 (1974).

Defendants suggest that by charging increased licensing fees, plaintiffs have a sufficient marketing alternative available to recoup any losses from lost film or videotape sales. This theory is based on the findings of the court in *Universal City Studios, Inc. v. Sony Corporation of America*, 480 F.Supp. at 452, where the court concluded that the plaintiffs in that case had sufficient marketing alternatives to recoup some of the predicted losses caused by the home use of Betamax recorders.

Nevertheless, the marketing alternatives found by the courts in *Universal City Studios, Inc. v. Sony Corporation of America*, 480 F.Supp. at 452, or *Teleprompter Corp. v. Columbia Broadcasting System, Inc., supra,* or even *Twentieth Century Music Corp. v. Aiken, supra,* are not the same as those available to the plaintiffs in this case. The distinguishing characteristic here is that almost all the copyrighted works videotaped and copied by the defendants were originally broadcast by a public television station chartered by the Board of Regents as part of instructional television programming. The costs of this programming are not borne by commercial advertisers, or corporate sponsors, or even member contributions, but by the New York State Education Department.

This is in sharp contrast to the plaintiffs' ability to engage in compensating commercial market activities as a result of home videotaping, as found in *Universal City Studios, Inc. v. Sony Corporation of America,*

---

two media services received 36 combined requests for "Two Mountainlands" in 1974–1975.

480 F.Supp. at 452; [16] or a small restaurant playing copyrighted songs broadcast by a commercial radio station, *Twentieth Century Music Corp. v. Aiken,* 422 U.S. at 163 n.14, or the interception and rechanneling of copyrighted commercial television programs by community antenna television (CATV) systems to paying subscribers, as in *Teleprompter Corp. v. Columbia Broadcasting System,* 415 U.S. at 411–13, 94 S.Ct. at 1139–40. The Court in *Teleprompter* noted that any increased use of the copyrighted material could lead to additional compensation for the copyright holder through various economic adjustments in the market place. William Deneen, president of LCA, testified at trial that if his corporation were to continue to license its works for educational broadcast and institutional off-the-air videotaping continues, the cost of licensing these broadcasts would increase from $55 to $5,000 per 30-minute film. He estimated that this increased fee would be necessary for film producers to recoup their film and videotape losses caused by off-the-air videotaping. He also testified that this $5,000 licensing fee would be prohibitive for any instructional television station to pay. The court notes that at this $5,000 rate, the entire annual WNED instructional television budget if allocated solely for the purchase of broadcast licenses would be exhausted in six days.[17]

There are no commercial sources available to compensate plaintiffs if they choose to license their works for broadcast by instructional television stations, and these works are subsequently videotaped and copied by the defendants. The sole source of funds for broadcast licenses in this case is the State of New York. From the testimony at trial, plaintiffs' only available marketing alternative to recoup their losses has been to stop selling licenses to educational networks and stations altogether. Fair use must be reasonable, and while freezing economic arrangements for copyright holders is not reasonable, it is also not reasonable to drive plaintiffs from the educational television market. Plaintiffs' choice of facing unlimited videotape copying or abandonment of the educational television market cannot be seen as providing reasonable market alternatives to fair use by the defendants.

## PURPOSE AND CHARACTER OF THE USE

The non-profit educational use of the plaintiffs' works by BOCES is uncontradicted by the evidence at trial, and attorneys for the parties stipulated at trial that all the copyrighted works are of educational value. In this manner, the purpose and character of the defendants' use is similar to that of the National Library of Medicine and the National Institute of Health, as found in *Williams & Wilkens v. United States, supra.*

While "courts have tended to be most receptive to unauthorized use of educational, scientific, and historical works," *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.,* 626 F.2d 1171, 1176 (5th Cir. 1980), it does not necessarily mean that a non-commercial or an educational motive will invariably sanction fair use. *Cf., Universal City Studios, Inc. v. Sony Corporation of America,* 659 F.2d at 972, n.9 (non-commercial motive does not mean fair use). As the House Report on the New Copyrights Act noted, non-profit educational use should be weighed along with other factors, and this type of use is not conclusive of fair use. H.R.Rep.No.94–1476, 94th Cong., 2nd

---

**16.** These marketing considerations appear to have been rejected by the Ninth Circuit on appeal:

The district court seems to recognize, on several occasions, that appellants will have to take affirmative steps to compete with the appropriated versions of their work. That such competition is necessary supports appellants' allegations of harm; at the least, it makes clear that the "infringing" activity *tends* to prejudice the potential sale of appellants' work.
*Universal City Studios, Inc. v. Sony Corporation of America,* 659 F.2d at 974.

**17.** Anthony Buttino, the Director of Educational Services at WNED, testified that the station received approximately $180,000 per year from the State of New York for instructional television broadcasting.

Sess., 63 (Sept. 3, 1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, 5659, at 5679.

Fair use is a concept based upon reasonableness, *Meeropol v. Nizer*, 560 F.2d at 1070; *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d at 310, and although the purpose and character of the use here is clearly educational and non-commercial, the massive scope of the videotape copying and the highly sophisticated methods used by the defendants in producing and distributing these copies cannot be deemed reasonable, even under the most favorable light of fair use for non-profit educational purposes.

While not controlling in this instance, the Congressional Reports on the 1976 Copyright Legislation are helpful in outlining acceptable fair use limits in educational settings. In this respect, the Senate Report suggests considerations such as "spontaneity" and whether the use involved "single or multiple copying" in determining educational fair use. The Senate Report states that the fair use doctrine would apply to a teacher who acts individually in making one or more copies for temporary use in classroom teaching but that

> [a] different result is indicated where the copying was done by an educational institution, school system or larger unit or where copying was required or suggested by the school administration, either in special instances or as part of a general plan.

S.Rep.No.94–473, 94th Cong., 1st Sess., 63 (Nov. 20, 1975). Concerning multiple copying, the Senate Report suggests considerations such as whether the number of copies "reproduced was limited to the size of a class, whether circulation of the copies was permitted beyond the classroom, and whether the copies were recalled or destroyed after temporary use." *Id.* at 63.

Here it is evident that BOCES has engaged in a general plan of copying plaintiffs' copyrighted works, and the number of videotaped programs reproduced by the Videotape Service was limited only by teachers' requests for copies sent to the Service.

There was no provision for returning the copies to the Videotape Service after their use, nor were there any provisions for erasure of the copies after their classroom use. Further, in at least one instance, a videotape copy was circulated "beyond the classroom," since it was made for a profit-making, non-educational institution.

BOCES has argued that the works in question were used in the classroom for research and study purposes. Certainly, copyrighted works may be used for comment, research, criticism, and independent work, *Robert Stigwood Group Limited v. O'Reilly*, 346 F.Supp. 376, 385 (D.Conn. 1972), *rev. on other grounds*, 530 F.2d 1096 (2d Cir. 1976), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); *Loew's Incorporated v. Columbia Broadcasting System, Inc.*, 131 F.Supp. 165, 175 (S.D.Cal. 1955); *aff'd sub nom. Benny v. Loew's, Incorporated*, 239 F.2d 532 (9th Cir. 1956), *aff'd by an equally divided court*, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958), and undoubtedly some of the videotapes at issue here were used to promote these educational objectives. Nevertheless, this use must be reasonable, and in this case, the defendants' copying of plaintiffs' works exceeded any reasonable reproduction for purposes of criticism, comment, or review.

BOCES contends that a major consideration in the purpose and character of its videotape reproduction has been to promote educational·"access" to the television broadcasts of the plaintiffs' works. Defendants argue that through off-the-air videotaping and time-shifting, teachers have the ability to preview television programs and determine whether the programs are suitable for classroom instruction. Educators are able to arrange lesson plans to include the material, and students may learn from the videotapes at a time relevant to their studies—irrespective of when a program is actually aired by a television station. Defendants suggest that through this form of time-shifting and videotaping in general, learning is not only enhanced, but even more broadly, this type of "access" has become an "absolute necessity" if educational televi-

sion is to be used in the classroom at all. As a consequence, educational change brought about by technological advances has permitted this new "access" and resulted in the necessity for videotaping and its fair use for classroom purposes.

Yet, it is important to remember that 16 of the 19 works in this case were already owned by BOCES in film format, and as a result, teachers were not totally dependent on educational television broadcasts or the Videotape Service for access to these works. Under these circumstances, it is difficult to find any absolute necessity for videotaping when educational "access" to these same works may be attained through the Print Film Service.

Concerning the three videotaped works which were not available to teachers through the Print Film Service, defendants have not shown that their videotaping practices justify off-the-air videotaping as an absolute necessity for classroom access to these works.[18] First, while time-shifting may be an important technological advancement, the testimony at trial of Dr. Raymond Graf, Chief of the New York State Bureau of Educational Communications, makes clear that educational television broadcasts were viewed and used in classrooms prior to this technological development. Although on-the-air broadcasts may give teachers less flexibility to preview programs and plan lessons accordingly, it does not in fact totally preclude access to educational instructional television programs by educators and students. Second, Anthony Buttino of WNED testified that the television station has developed an instructional television programming schedule which is distributed to teachers and educational representatives in the school districts and includes all the programs broadcast by the station during the school year. This schedule gives a description of the program and

also explains the various off-the-air rerecording and playback rights for the programs aired. It seems designed to promote the kind of educational access to instructional television broadcasts, which concerns the defendants while preserving the plaintiffs' rights under the copyrights laws.

Third, at trial, the plaintiffs described various licensing agreements entered into between educational film corporations and educational entities involving the use of plaintiffs' copyrighted works and the reproduction of videotape copies. Although these agreements were admitted into evidence at trial only to show possible harm to the plaintiffs' works, their existence, as well as the other methods described, clearly indicate various possible means available for reconciling educational access and technological change with protection of the plaintiffs' copyrights.

Finally, BOCES suggests that the plaintiffs are free to stop licensing their copyrighted films for broadcast by educational television stations, but, having decided to do so, unlimited "access" by off-the-air videotaping should not be denied teachers and students in educational institutions. Yet, it would also seem that this type of "access" has already caused plaintiff LCA to stop licensing its films to the Eastern Educational Network. Further, Anthony Buttino of Channel 17 testified that the programming committee of the television station, which is composed of both teachers and television personnel, is presently attempting to limit educational broadcasts to only programs where there is a right to rerecord these programs for a period of one year. Under this arrangement, only programs which allow off-the-air taping and videotape copying will be broadcast by WNED. It would appear that these recent measures will limit defendants' television "access" to plaintiffs' works to a greater extent than has existed

18. Two of the nineteen works here, Time-Life's "The Ultimate Machine" and "The Ultimate Risk," were not broadcast as part of instructional television programming by WNED although they were both videotaped and copied by the defendants. The Print Film Service purchased a copy of "The Ultimate Machine" in

1974. For the 17 remaining works which were broadcast as part of instructional television programming and copied by the Videotape Service, BOCES did not own film versions of "Miguel: Up from Puerto Rico," and "Siu Mei Wong: Who Shall I Be?".

in the past, with the possible result suggested by the defendants of removing plaintiffs' works from the educational airways altogether.

## THE NATURE OF THE COPYRIGHTED WORKS

The nature of the copyrighted works generally refers to the type of material used and whether distribution of the material would serve the public interest. *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d at 307. As previously noted, the nature of the copyrighted works here is clearly educational.

Defendants have argued that *Williams & Wilkins Co. v. United States, supra*, is strongly analogous to the educational nature of the works at issue in this case. Notwithstanding this apparent similarity, one of the significant reasons for the Court of Claims' fair use holding was the unavailability of older issues of medical journals from journal publishers. The court discussed the difficulty in obtaining medical articles over three years old and further noted that even plaintiff Williams & Wilkins Company did not attempt to keep back issues of their journals. Rather, the publisher referred requests for reprints to the authors of the articles. *Williams & Wilkins Co. v. United States*, 487 F.2d at 1356–57 and n.17 at 1357. As a result of this general unavailability of scholarly material, the court expressed concern that medical and scientific personnel would be denied access to the important knowledge which the articles contained unless photocopying was permitted as fair use. *Id.* at 1356.

This type of concern was also reflected in the Senate Report on the 1976 Copyrights Act. The Report suggests that a key element in analyzing the nature of the copyrighted work is the availability of the work to the potential user: "If the work is out of print and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case ..." S.Rep.No.94–473, 94th Cong., 1st Sess., 64 (Nov. 20, 1975).

In this case, none of the 19 films was out of print when the videotape copies were created, and all of the films were available "through normal channels" from the plaintiffs. Unlike the publisher, Williams & Wilkins Co., all the plaintiffs testified that they were readily able to supply and sell copies of their works in either film or videotape formats to meet the needs of educational customers.

Further, in *Williams & Wilkins Co. v. United States, supra*, the court noted that libraries would not "purchase extensive numbers of whole subscriptions to all medical journals on the chance that an indeterminate number of articles in an indeterminate number of issues will be requested at indeterminate times," and it was "unrealistic to expect scientific personnel to subscribe regularly to large numbers of journals which would only occasionally contain articles of interest to them." *Id.* at 1357, as justification for photocopying as fair use.

Here, 16 of the 19 films at issue were already owned by BOCES and available to teachers for classroom use, and various means exist for the defendants to view educational films before deciding to purchase them. Thus, there does not seem to be any requirement that BOCES purchase "whole subscriptions" on the chance that a film might prove relevant to classroom instruction. In short, there are no factual characteristics necessary to justify fair use based upon the unavailability of the specific copyrighted works in this case.

The defendants have argued that the distribution of the plaintiffs' copyrighted works serves the public interest in public education and in the dissemination of information and the development of a body of knowledge. In promoting the progress of science and the useful arts under the United States Constitution, Article 1, section 8, clause 8,

> courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of the arts, science, and industry

*Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d at 307; *Berlin v. E. C. Publications*, 329 F.2d at 544. In this respect, the fair use doctrine provides a means of balancing the exclusive rights of a copyright holder with the public interest in dissemination of information affecting these universal concerns. *Meeropol v. Nizer*, 560 F.2d at 1068; *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d at 94.

In deciding the relationship of the copyright holder's interest to the public interest, courts have sanctioned fair use ranging from a few quotations, *Rosemont Enterprises, Inc. v. Random House, Inc.*, *supra*, to the photo duplication of entire essays and articles. *Williams & Wilkins Co. v. United States, supra.* In this evaluation, the primary object of the Copyrights Act—the public interest in the dissemination of information, *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010 (1932), must also be balanced against the author's motivation to create new works. *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954); *Twentieth Century Music Corp. v. Aiken*, 422 U.S. at 156, 95 S.Ct. at 2043. The court in *Williams & Wilkins Co. v. United States, supra*, found that with rare exceptions, the authors of medical articles were not paid for their works and that these authors were not interested in a financial return from their writing efforts. *Id.* 487 F.2d at 1359. Further, the court noted that some of the medical journal authors found the photocopying to be an aid in the advancement of science and knowledge. *Id.* at 1359. Thus, an author's motivation to create new works may even be enhanced by the photocopying of medical articles and essays.

This is in sharp contrast to the situation here. The educational nature of the plaintiffs' works contemplates a national distribution to a market of schools, churches, libraries, and educational institutions. The financial returns from a successful production of educational films are used, at least in part, for the production of additional educational films to be sold in this national market. Without dwelling upon the harm

factor, it is not difficult to see how the motivation to create new works could well be stifled or eliminated altogether if the extensive copying practices of BOCES were to continue in an unregulated fashion. As the United States Court of Appeals for the Second Circuit stated in *Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14, 23 (2d Cir. 1976),

> the copyright law should be used to recognize the important role of the artist in our society and the need to encourage production and dissemination of artistic works by providing adequate legal protection for one who submits his work to the public [citation omitted].

The educational nature of these films and videotapes and their considerable value to the educational process are well recognized and are not disputed by the parties or this court. Nevertheless, the educational contents of the works in this case cannot be employed as a means to justify as in the public interest the extensive and systematic copying as documented here. Courts have determined that the "public has a right to know the facts, but does not have a right to know them in the particular form in which an author assembles and expresses them." *H. C. Wainright & Co. v. Wall Street Transcript Corp.*, 418 F.Supp. 620, 624 (S.D.N.Y. 1976), *aff'd* 558 F.2d 91 (2d Cir. 1977). Certainly, educational institutions can use any factual information revealed in the plaintiffs' film for teaching and the enlightenment of students. *Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.*, 621 F.2d 57, 61 (2d Cir. 1980), and the public interest is protected here because the "free flow of information is assured by the law's refusal to recognize a valid copyright in facts." *Id.* at 61. The educational contents and nature of the films in this case does not, in and of itself, empower "a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Id.* at 61.

## SUBSTANTIALITY

The fourth factor, "substantiality of the use," refers to the quantity and quality

of the copyrighted material appropriated by the defendants. *See Berlin v. E. C. Publications*, 329 F.2d at 544. Generally, the more substantial the appropriation from the copyrighted work, the less likely fair use will be considered a defense. *Universal City Studios, Inc. v. Sony Corporation of America*, 480 F.Supp. at 454.

Defendants rely on the Court of Claims analysis in *Williams & Wilkins Co. v. United States*, 487 F.2d at 1353, where the court found that the copying of complete medical articles on a massive scale was held to be fair use. Nevertheless, in the preliminary injunction, this court found that there was a significant difference between copying an entire article from a medical journal and reproducing an entire copyrighted work on videotape, *Encyclopaedia Britannica v. Crooks*, 447 F.Supp. at 251, and the facts adduced at trial have only confirmed this conclusion.

Plaintiffs argue that off-the-air videotaping amounts to such substantial copying that this practice can never be considered fair use under the copyright statutes. Such a sweeping contention must be rejected since "the idea that copying an entire copyrighted work can never be fair use is an overbroad generalization, unsupported by the decisions, and rejected by years of accepted practice." *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d at 1177, n.15, *quoting Williams & Wilkins Co. v. United States*, 487 F.2d at 1353.[19]

Within the framework of reasonableness, however, substantial and verbatim copying has usually precluded a finding of fair use. *Meeropol v. Nizer*, 560 F.2d at 1070; *Rosemont Enterprises, Inc. v. Random House,*

*Inc.*, 366 F.2d at 310. In this case, defendants have conceded that BOCES' off-the-air videotaping usually involved copying the entire copyrighted work. More significantly, some of these copies were kept and used for 10 years, and the videotape copying amounted to a virtual substitution for the purchase or license of the plaintiffs' works. Such substantial use and appropriation cannot be considered fair use in relation to the plaintiffs' copyrighted works.

■ Defendants have suggested that any analysis of substantiality must be considered in combination with the harm factor.[20] Whether analysis of the individual four factors must be considered in a discrete manner or in combination with one another need not concern us here. Fair use is an equitable doctrine based upon reasonableness involving an analysis of all the factors as well as other considerations applied to the specific facts of an individual case. In this case, the harm caused by the defendants to the plaintiffs' copyrighted works has been amply demonstrated. Regardless of whether this fourth factor is analyzed in a discrete manner or in combination with the harm factor, it does not shift any weight towards the defendants' contention of fair use.

## DEFENDANTS' CONSTITUTIONAL CONTENTIONS

Defendants also argue that any application of the copyright law to this case conflicts with the constitutional foundation of the copyright statutes to "promote the progress of science and the useful arts." Article 1, section 8. The public interest

19. Additionally, plaintiffs' blanket assertion that off-the-air videotaping can never be fair use is not supported by the House and Senate Reports on the 1976 Copyrights Act when videotaping is used for non-profit classroom purposes. *See* H.R.Rep.No.94–1476, 94th Cong., 2nd Sess., 71–72 (Sept. 3, 1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, 5659 at 5685; S.Rep.No.94–473, 94th Cong., 1st Sess., 66 (Nov. 20, 1975).

20. Defendants' argument is primarily based on the *Sony* district court's conclusion that the substantiality factor should only be considered

when copying has produced harm to the plaintiff. 480 F.Supp. at 455–56. In reaching this conclusion, the district court stated that in *Meeropol v. Nizer, supra*, and *Rosemont Enterprises v. Random House, Inc., supra*, "the Second Circuit was concerned about substantiality only when it produced harm to the complaining party." *Universal City Studios, Inc. v. Sony Corporation of America*, 480 F.Supp. at 455. On appeal, the Ninth Circuit found fault with this interpretation. *Universal City Studios, Inc. v. Sony Corporation of America*, 659 F.2d at 973.

**1180**

aspects of this argument have been previously discussed, and the defendants' contentions are apparently based upon the plaintiffs' choice of media to disseminate their works.

Defendants contend that plaintiffs' works were originally broadcast over the public airways; that these broadcasts were intended to be received free of charge; and therefore, in licensing these films for broadcast by WNED, the plaintiffs knew and expected that the broadcasts would be received free of charge. Further, defendants argue that most of these works were broadcast by public television stations and that these same broadcasts were paid for with public funds. These facts lead the defendants to conclude that any application of the copyright statutes to bar educational off-the-air recordings made from television programs broadcast by publicly financed networks and/or stations would be unconstitutional.

■ This conclusion is as farfetched as it is erroneous. The court can find no constitutional impediment in the licensing of plaintiffs' works for television broadcast, the use of public television stations to transmit these broadcasts, and the protection of plaintiffs' copyrighted works under the law. In this case, all of the 19 works were broadcast with a copyright notice prominently displayed. The plaintiffs' choice of media or the source of funding used for purchasing broadcast licenses does not abrogate their rights as copyright holders. Similarly, whether plaintiffs knew and expected that the broadcasts would be received free of charge does not change their status as copyright holders or mean that they have abandoned their rights under the copyright laws.[21]

■ In order for a copyright holder to abandon the rights granted by the statutes, the copyright holder must perform some overt act which manifests an intent to surrender rights in the copyrighted material. *National Comics Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 598 (2d Cir. 1951); *Dodd, Mead & Co., Inc. v. Lilienthal,* 514 F.Supp. 105, 108 (S.D.N.Y.1981). At trial, there was no evidence adduced of overt acts by the plaintiffs manifesting an intent to surrender their rights in the copyrighted material to BOCES. The plaintiffs' various past policies and attempts to accommodate the temporary educational use of their works by schools does not waive their copyright protection, since even "[m]ere inaction or negative behavior will not suffice." (Citations omitted.) *Dodd, Mead & Co., Inc. v. Lilienthal,* 514 F.Supp. at 108.

■ Defendants next attempt to support their copying practices by claiming free speech and the right of access to information under the First Amendment protects their videotape reproduction efforts. Although news events, factual developments, or factual information may not be copyrighted,

> [w]hat is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshal facts, his choice of words, and the emphasis he gives to particular developments.

*Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d at 95–96. This dichotomy was explained in *Mazer v. Stein,* 347 U.S. at 217, 74 S.Ct. at 470: "a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself."

---

**21.** As one commentator noted:

> While use of public airwaves is distinctive to this material, it does not justify altering the standards of copyright infringement. No one has ever claimed that it is fair use to copy material stored in public libraries or archives merely because public means have been used to widen dissemination. Nor has it been said that because the publicity generated by displaying a work of art in a public museum generated a market for secondary material which thereby enriched the copy-

> right owner, the copyright holder has waived his rights in the work of art itself. Use of public areas to disseminate copyrighted material and enrich the copyright holder has never been a form of abandonment of copyright ownership. That copyright holders and viewers have no direct economic relationship does not imply that viewers have any greater right to infringe plaintiffs' copyrights.

"Betamax," 21 *Santa Clara Law Review,* 49, 71–72 (1981).

When factual information contained in a film is inextricably related to the film's expression of that information, the use of the film to secure broad distribution of the facts may be permitted. *Time, Inc. v. Bernard Geis Associates, supra.* These circumstances involving motion pictures are uncommon. The court in *Iowa State University Research Foundation v. American Broadcasting Companies, Inc.*, 621 F.2d at 61, n.6, stated that

> *Geis* involved an author's unauthorized use of the Zapruder film of the Kennedy assassination. In this almost unique instance, it is at least arguable that the informational value of that film cannot be separated from the photographer's expression, [citation omitted], thereby indicating that both should be in the public domain. We believe, however, that such situations are rare.

At trial, there was no claim made that any of the plaintiffs' works contained unique characteristics similar to the Zapruder film. Therefore, the defendants cannot claim First Amendment protection for their videotaping practices, since BOCES has copied and appropriated both the facts revealed in the copyrighted works and the mode of expressing those same facts. *See Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corporation*, 562 F.2d 1157, 1170–71 (9th Cir. 1977).

## OTHER CONTENTIONS

Defendants also suggest that since plaintiffs voluntarily licensed their copyrighted works for broadcast over the airways, this constituted fair use because these broadcasts were intended to be received by the public free of any costs. *See Universal City Studios v. Sony Corporation of America*, 480 F.Supp. at 453. Under the New Copyrights Act, Section 107 cannot be read as to give the defendants such extensive rights to videotape and duplicate plaintiffs' works as accomplished here. The House Report accompanying the legislation briefly mentions the possibility that the fair use doctrine may have some *limited* application to off-the-air videotaping for non-profit classroom educational use. H.R.Rep.No.94–1476, 94th Cong., 2nd Sess. 71–72 (Sept. 3, 1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, 5659 at 5685. The Senate Report states only that "temporary use" would permit a school to retain an off-the-air recording for a *limited* period of time after broadcast. S.Rep.No.94–473, 94th Cong., 1st Sess., 66 (Nov. 20, 1975). BOCES' massive and systematic videotape copying and the retention of some master videotapes for up to ten years cannot be considered "limited" or fair use under 17 U.S.C. § 107.

Under the Old Act, a broad interpretation of the Supreme Court's decision in *Twentieth Century Music Corp. v. Aiken, supra,* may be applicable to BOCES, permitting defendants the right to perform plaintiffs' copyrighted works. Yet, the remainder of the copyright holder's rights, particularly the right to make copies, is clearly retained under the Old Act. *See* "Copyright Infringement in Video Recording," 30 Cath. Univ.L.Rev. 621, 641 (1981); "Betamax and Infringement of Television Copyright," 1977 Duke L.Jl. 1181, 1196. Although the issue of whether BOCES may perform plaintiffs' copyrighted works deserves further consideration by the parties, plaintiffs' decision to voluntarily license their works for television broadcasts does not constitute fair use for BOCES to engage in their extensive videotape copying.

Defendants contend that their past videotaping practices were sanctioned because BOCES was a "transmitting organization" as defined in Section 1(f) of the Old Act. Under the New Copyrights Act, defendants claim that BOCES is now a "broadcasting entity," and is similarly authorized to undertake off-the-air recording and copying pursuant to 17 U.S.C. § 114. These two theories are based on their belief that BOCES receives programs broadcast by WNED and retransmits these programs by microwave or cable television to receivers located in school classrooms or videotapes these programs for later use and distribution for the member schools. In this manner, WNED, BOCES, and the schools all formed a

"transmitting organization" and now constitute a "broadcasting entity," permitting BOCES to reproduce videotape copies of plaintiffs' works.

Defendants support these theories by citing numerous federal studies, commission reports, as well as communication and educational statutes and amendments enacted by Congress related to the growth and development of educational television. The court is in general agreement with the defendants' contention that Congress has promoted this growth since the enactment of the educational television amendments to the National Defense Education Act of 1958, but nowhere in this act, 20 U.S.C. § 541 *et seq.*, or the Elementary and Secondary Education Act, 20 U.S.C. § 843 *et seq.*, or the Communications Act of 1937 and its amendments, 47 U.S.C. § 390 *et seq.*, does Congress authorize BOCES' extensive off-the-air videotape reproduction as permissible under the copyright laws.

The legislative history of Section 1(f) of the Old Act reveals that it was promulgated by Congress in 1971 primarily to protect sound recordings from unauthorized duplication and record piracy. After expressing limited copyright protection to sound recordings, 17 U.S.C. § 1(f) stated "that this right . . . does not extend to . . . reproductions made by transmitting organizations exclusively for their own use." The House Report which accompanied the legislation attempted to explain the meaning and purpose of this legislation which BOCES believes was applicable to it as a transmitting organization:

> In the case of non-commercial public broadcasters, the proviso is not to be limited solely to reproductions made by public networks and stations transmitting the same programs but also extends to programs produced, duplicated, distributed, and transmitted by or through more than one public broadcasting agency or entity, so long as exclusively for educational use. In short, the copyright of sound recording does not restrict the use of public television or radio programs to any extent not provided in the present law.

H.R.Rep.No. 92–487, 92nd Cong., 1st Sess. (Sept. 22, 1971); *reprinted in* [1971] U.S. Code Cong. & Admin.News, 1566, 1573.

Whether in fact BOCES could have been considered a "transmitting organization" under 17 U.S.C. § 1(f) does not concern us, for it is clear that this section of the statute did not grant BOCES the right to reproduce and distribute videotape copies as accomplished here. The legislative history expressly stated that sounds accompanying "motion pictures" were to be excluded from the scope of this legislation because sound tracks or audio tracks were considered an "integral part of the motion pictures" and "were already accorded protection under subsections (*l*) and (m) of Section 1" of the Old Act. *Id.* at 1570–71. The legislative history further noted that

> "motion pictures" represent a broad genus whose fundamental characteristic is a series of related images that impart an impression of motion which is shown in succession, including any sounds integrally conjoined with the images. Under this concept the physical form in which that motion picture is fixed—film, tape, discs, and so forth—is irrelevant . . . . Thus, to take a specific example, if there is an unauthorized reproduction of the sound portion of a copyrighted television program fixed on videotape, a suit for copyright infringement could be sustained under section 1(a) of Title 17 rather than under the provisions of this bill . . . .

*Id.* at 1571. Since it is clear that section 1(f) as applied to transmitting entities was intended "not to restrict the use of public television or radio programs to any extent not provided in the present law," and the "present" copyright law already applied to the "unauthorized reproduction of the sound portion of a copyrighted television program fixed on videotape," the defendants' arguments concerning any congressional sanction under section 1(f) for their videotape copying practices is without merit.

Defendants similarly suggest that BOCES is a "broadcasting entity" as defined

under 17 U.S.C. § 114 of the New Act, and that this status indicates congressional approval for off-the-air videotaping and reproduction of the plaintiffs' works under the copyright laws. Section 114 is entitled, "Scope of Exclusive Rights in Sound Recording," and section 114(b) concerns the use of copyrighted *sound* recordings used by educational television and radio programs distributed by or through public broadcasting entities. The accompanying legislative history explains that:

> [t]his use of recordings is permissible without authorization from the owner of the copyright in the sound recording as long as "copies or phono-records of said programs are not commercially distributed by or through public broadcasting entities to the general public."

H.R.Rep.No. 94–1476, 94th Cong., 2nd Sess., 106 (Sept. 3, 1976); *reprinted in* [1976] U.S. Code Cong. & Admin.News, 5659, 5721–22.

Nowhere in this section of the statute nor in the related legislative history is there any mention of authorized off-the-air videotape reproduction of audiovisual works for educational purposes. BOCES maintains that there is no logical reason for assuming Congress would treat audiovisual transmissions any differently from sound recordings under 17 U.S.C. § 114. Yet, as the House Report makes clear,

> [t]he problem of off-the-air taping in nonprofit classroom use of copyrighted audiovisual works incorporated in radio and television broadcasts has proved difficult to resolve .... Nothing in Section 107 or elsewhere in the bill is intended to change or prejudge the law on the point.

*Id.* at 71–72; 5685, and the Supreme Court has observed that "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps-Howard Radio, Inc. v. Federal Communications Commission*, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942). If Congress intended to include audiovisual works and off-the-air videotape reproduction within the meaning of section 114, some expression of this intent would necessarily be manifested in the legislative history or in the

statute itself. Lacking any indication of this intent, this additional contention of BOCES is also without merit.

### ESTOPPEL

Defendants also suggest that estoppel precludes assertion of the plaintiffs' claim of rights under the copyright laws. BOCES argues that the extensive videotaping which has openly evolved over a period of some 14 years, the distribution of their catalogs, and the evolutionary custom of videotaping supports this contention.

In order to establish the defense of estoppel, the defendants must show (1) the plaintiffs had knowledge of the infringing conduct; (2) the plaintiffs intended that their conduct be acted on or acted so that the defendants had a right to believe it was so intended; (3) the defendants were ignorant of the true facts; and (4) the defendants relied on the plaintiffs' conduct to their detriment. *Hampton v. Paramount Pictures Corporation*, 279 F.2d 100, 104 (9th Cir. 1960), *cert. denied* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 535 (S.D.N.Y.1977), *aff'd* 592 F.2d 651 (2d Cir. 1978); *Rohauer v. Killiam Shows, Inc.*, 379 F.Supp. 723, 731 (S.D.N.Y. 1974).

Although BOCES' videotaping practices were certainly not hidden and educational videotape copying in general is widespread, from trial testimony, it does not appear that plaintiffs learned of BOCES' extensive copying until December, 1976. *See Encyclopaedia Britannica v. Crooks*, 447 F.Supp. at 252. The defendants can only point to one occurrence prior to this date of plaintiffs' possible specific knowledge of BOCES' videotaping activities. Norman Johnson testified that either in 1972–1973 or 1973–1974, a film salesman passed through the BOCES videotape library to examine a film chain machine. He said that although the salesman was suspicious of BOCES' videotape copying, Johnson assured him that the BOCES film library was not duplicating films. Johnson further testified that he could not state with certainty that the

salesman worked for any of the plaintiffs at the time of his visit and that their passage through the videotape library lasted less than five minutes. It was this same salesman who later obtained a copy of the videotape catalog in December, 1976, and forwarded it to plaintiff LCA, which led to the commencement of this action.

Whether this visit through the videotape library in either 1972–1973 or 1973–1974 amounts to "knowledge" by the plaintiffs for purposes of estoppel is at best speculative, but it is also important to add that all of the plaintiffs' 19 copyrighted works contained a copyright notice. Each of the plaintiffs' works was broadcast by the television stations containing this notice prominently displayed. In *Hampton v. Paramount Pictures Corporation*, 279 F.2d at 105, the court held that even though the defendant had openly showed plaintiffs' film for 13 years prior to the filing of a copyright infringement action, the defendant could not assert estoppel as a defense:

> Paramount's assertion of copyright was clearly printed on the film in question in strict accordance with statutory requirements. Paramount had the right to assume that this printed assertion of right, which was flashed on the screen every time the film was shown, provided ample notice to Hampton of Paramount's interest in the film. Being charged with this notice, Hampton could easily have ascertained the facts by making inquiry of Paramount.

*Id.* at 104.

■ Accordingly, the notice of copyright appearing in all of plaintiffs' works precludes BOCES' defense of estoppel. There is nothing in these notices which would lead BOCES to believe that such extensive and prolonged use by videotape copying was authorized or intended by plaintiffs.[22] BOCES' failure to inquire of the plaintiffs about authorized reproduction of these works—which they could have easily ascertained—cannot be construed as "custom" authorizing the videotape copying of these copyrighted works.

## SUMMARY

Based upon the foregoing discussion, the following summarizes the court's findings of fact and conclusions of law in this case:

1. Plaintiffs individually own valid copyrights to or are the exclusive licensees of the 19 copyrighted works in question.

2. Each of the 19 works contained a copyright notice which was prominently displayed when the work was broadcast by television stations.

3. Defendants videotaped these copyrighted works off-the-air and created master videotapes of these copyrighted works.

4. These master videotapes were kept and used for making and distributing videotape copies for several years and, in some instances, for up to 10 years.

5. Defendants subsequently made videotape copies of each copyrighted work from a master videotape or rebroadcast these works to and for schools in school districts subscribing to BOCES' Videotape Service.

6. Defendants did not secure permission from plaintiffs to make master videotapes, or to make derivative videotape copies, or to distribute these videotape copies to schools, or to rebroadcast plaintiffs' works via closed circuit or cable television.

**22.** The works of plaintiffs LCA and Encyclopaedia Britannica each contained a printed legend stating, "Copyright and all rights of reproduction, including by television reserved" in addition to the copyright notice. Encyclopaedia Britannica's works also contained the following notice:

> This work may not be transmitted by television or other devices of process nor copied, recast, transferred, adapted or outlined in any manner, in whole or in part without a license. For information regarding a license

write Encyclopaedia Britannica Educational Corp., Chicago, Illinois.

Plaintiff Time-Life's work, "The Ultimate Machine," contained the notice: "Time, Inc. 1970 all rights reserved." For 18 of the 19 works, these copyright notices were copied by the defendants as part of their videotape reproduction efforts.

BOCES' master tape for Time-Life's work, "The Ultimate Risk," had been erased and was not available at trial.

7. Plaintiffs' voluntary licensing of their works for broadcast by instructional television stations does not create unlimited fair use by the defendants of these works, nor the abandonment of plaintiffs' rights under the copyright laws.

8. BOCES was neither a transmitting organization nor is it a broadcasting entity authorized to make and distribute videotape copies of plaintiffs' copyrighted works.

9. Defendants' highly organized and systematic practice of making off-the-air videotapes of plaintiffs' copyrighted works for use in later years and the making of numerous derivative copies of plaintiffs' copyrighted works does not constitute fair use under the copyright laws, is not protected under the First Amendment, nor is it insulated by the doctrine of estoppel.

## COPYRIGHT INFRINGEMENT VIOLATIONS, DAMAGES, COSTS, AND ATTORNEYS' FEES

Although it is clear that BOCES' videotape copying infringed upon plaintiffs' rights as copyright holders in violation of 17 U.S.C. § 1(a), plaintiffs also request the court to find two additional copyright violations for each of the 19 works; vending copies of their works pursuant to 17 U.S.C. § 1(a), and publicly performing these works in violation of 17 U.S.C. § 1(d). The issues of whether BOCES' videotaping activities constitute vending and performance violations under the Old Act are essential to any determination of damages, and these issues deserve further consideration by the parties before any determination can be made. A brief summary of the parties' positions on damages demonstrates some of the more discernible questions in this complex area.

Plaintiffs maintain that actual damages are incalculable in this case, and they request the court to award minimum statutory damages of $250 per infringement, pursuant to 17 U.S.C. § 101(b) of the Old Act. Within the three-year statute of limitations set forth in 17 U.S.C. § 115(b), they claim that every time a videotape copy was made, a copying infringement occurred, and at least one vending infringement and performance infringement followed. Although the videotape copies delivered to the schools may well have been shown in the classrooms on more than one occasion, plaintiffs claim only one performance infringement per videotape copy made by the Videotape Service.

Plaintiffs also claim 5 additional copying infringements occurred when BOCES created 5 of the 19 master videotapes of their works within the statute of limitations. They further claim another 13 performance infringements occurred when BOCES rebroadcast their works via closed circuit or cable television to school classrooms. Adding all these infringements together, plaintiffs calculate that BOCES infringed upon their copyrights a total of 372 times and, at $250 per infringement, statutory damages of $93,000 should be awarded to them.

Defendants contend that only actual damages should be awarded in this case. They argue that these damages amount to a total of $265, the price of one additional print film which might have been purchased by the Film Service, but for their videotape copying. In light of the court's discussion of fair use, this analysis of actual damages is inadequate.

Assuming without deciding whether statutory damages may be appropriately awarded in this case, plaintiffs argue that the court is precluded from considering defendants' good faith belief in fair use in determining statutory damages under the Old Act. *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d at 658, n.10. Under 17 U.S.C. § 504(c)(2) of the New Copyrights Act, if the court finds an educational institution infringed upon copyrighted material in the honest belief that what it was doing constituted fair use, the court is precluded from awarding statutory damages. *See* H.R.Rep.No. 94–1476, 94th Cong., 2nd Sess., 163 (Sept. 3, 1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News 5659, 5779. And even under the Old Act, the award of statutory damages for innocent infringement "is not without dispute and . . . there is no clear concensus as to

the applicable rule." *Plymouth Music Co. v. Magnus Organ Corp.*, 456 F.Supp. 676, 681 (S.D.N.Y.1978).

In this respect, plaintiffs' claim for minimum statutory damages may not be the simple arithmetic calculation they propose. Section 101(b), which "is an ambiguous hodgepodge of improvisations," *Davis v. E. I. DuPont de Nemours & Company*, 249 F.Supp. 329, 331 (S.D.N.Y.1966), indicates two additional methods of calculating statutory damages for "motion pictures" under the Old Act:

[I]n the case of the infringement of an undramatized or non-dramatic work by means of motion pictures, where the infringer shall show that he was not aware that he was infringing, and that such infringement could not have been reasonably foreseen, such damages shall not exceed the sum of $100; and in the case of an infringement of a copyrighted dramatic or dramatico-musical work by a maker of motion pictures and his agencies for distribution therefor to exhibitors, where such infringer shows that he was not aware that he was infringing a copyrighted work, and that such infringements could not reasonably have been foreseen, the entire sum of such damages recoverable by the copyright proprietor from such infringing maker and his agencies for the distribution to exhibitors of such infringing motion picture shall not exceed the sum of $5,000 nor be less than $250, and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty.

Aside from basic questions, such as BOCES' lack of awareness of infringement and whether the court should consider the videotapes here as "motion pictures," the statute's distinction between "non-dramatic" and "dramatic" works for determining damages and exactly what copyright infringements might be included in the "entire sum of damages" are critical questions that deserve the attention and consideration of the parties.

Further, even if the court were to determine that statutory damages were appropriate to award to the plaintiffs, the parties have not discussed the effect or applicability of the "time test," which looks to the amount of time which elapsed between separate acts of infringement, *Baccaro v. Pisa*, 252 F.Supp. 900, 904 (S.D.N.Y.1966), or the "heterogenity test," which determines whether a single integrated transaction results in one infringement, *Davis v. E. I. DuPont de Nemours & Company*, 249 F.Supp. at 337. Finally, the Supreme Court's decision in *Twentieth Century Music Corp. v. Aiken, supra*, and its effect, if any, upon BOCES' performance of plaintiffs' copyrighted works must be addressed by the parties.

Accordingly, the court directs the parties to file any additional affidavits or briefs concerning the award of actual or statutory damages, the type and number of copyright violations that should be considered by the court, the applicable measure of damages as prescribed under 17 U.S.C. § 101(b), as well as the numerous related issues which arise from these questions by August 6, 1982.

Plaintiffs have also requested costs and attorneys' fees. Under 17 U.S.C. § 116 of the Old Copyrights Act, it is mandatory that the court allow costs in a copyright infringement suit to the prevailing party, but under the New Act, effective January 1, 1978, this award is now discretionary, 17 U.S.C. § 505. Since this action was commenced in October, 1977, it would seem that the provisions of section 116 are applicable to this case. Yet, because the parties have not addressed the scope and applicability of the court's discretion in awarding costs under 17 U.S.C. § 505 to plaintiffs' claim for costs in this litigation, the court directs them to do so within the aforementioned specified time.

■ An award of attorneys' fees in copyright actions lies in the discretion of the court under both the Old Act, 17 U.S.C. § 116, and the New Act, 17 U.S.C. § 505. When faced with novel, unsettled, or complex problems in copyright cases, courts have refused to award attorneys' fees. *Ei-*

senschiml v. Fawcett Publications, Inc., 246 F.2d 598, 604 (7th Cir. 1957); Norbay Music, Inc. v. King Records, Inc., 249 F.Supp. 285, 289–90 (S.D.N.Y.1966). This case has presented such novel issues, based upon recent technical advancements as well as unsettled issues of law and fact. The defendants have had reasonable grounds for the position they have taken in respect to fair use, capably presented by counsel. In a case such as this, the interest of justice would best be served by refusing to award attorneys' fees. Lowes Incorporated v. Columbia Broadcasting System, Inc., 131 F.Supp. at 186.

## INJUNCTION

The plaintiffs seek a permanent injunction restraining and enjoining the defendants from copying their works encompassing four areas of relief. First, they seek an injunction restraining and enjoining the defendants from copying the copyrighted works sued upon in this litigation. Second, they seek an injunction restraining and enjoining the defendants from copying any of the other copyrighted works in the BOCES videotape library to which the plaintiffs have the exclusive right of distribution, or which the plaintiffs own. Third, they seek an injunction to prevent any future copyrighted works that may be copyrighted by the plaintiffs or for which the plaintiff may acquire the exclusive right of distribution to be copied by BOCES. Finally, plaintiffs request that the existing BOCES videotape library containing plaintiffs' works be erased.

■ Generally, a plaintiff is entitled to a permanent injunction in a copyright action when liability has been established and there is a threat of continuing violations. Universal City Studios, Inc. v. Sony Corporation of America, 659 F.2d at 976; 3 Nimmer on Copyrights § 14.06[B] at 14–53–14–54, and under the New Copyrights Act, a court "may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of copyright." 17 U.S.C. § 502.

■ Given the past practices of BOCES and the testimony of BOCES personnel at trial, the court finds there is a strong possibility that defendants will engage in continuing copyright violations unless an injunction is issued. Clearly, this injunction should include plaintiffs' 19 copyrighted works in suit. Concerning future copyright infringement activities, "courts have not hesitated to enjoin the infringement of future registered works when equity has required," Association of American Medical Colleges v. Carey, 482 F.Supp. 1358, 1364 at n.15 (N.D.N.Y.1980), and equity dictates such an injunction here.

For the same reasons, an injunction encompassing the plaintiffs' other copyrighted works maintained in the BOCES videotape library is also appropriate. Plaintiffs contend that in addition to the 19 films involved in this suit, there are another 126 works exclusively distributed by them on master videotapes in the BOCES videotape library. They point to the fact that for plaintiffs LCA and Time-Life, some 845 videotape copies of these 126 works were manufactured by BOCES. Where, as here, the liability of the infringer has been determined and there has been a long history of continuing infringement, it would be inequitable to grant an injunction for the 19 copyrighted films without enjoining defendants from copying plaintiffs' 126 other copyrighted works. Cf. Ortho-O-Vision, Inc. v. Home Box Office, Inc., 474 F.Supp. 672, 686 (S.D.N.Y.1979) (inequitable to grant a copyright owner summary judgment on the issue of liability without enjoining the infringement of future works). There is no indication whatsoever that these 126 other works held by the defendants are not in fact plaintiffs' copyrighted works, and it would serve no purpose to relitigate the same issues with respect to each of these 126 films and videotapes. As the equitable powers of the court include the ability to enjoin infringement of future registered works, in this specific instance, the court determines that it is well within its equitable powers to enjoin the infringe-

ment of plaintiffs' presently existing copyrighted works in BOCES' possession.[23]

For the foregoing reasons, plaintiffs' request for a permanent injunction is granted, and defendants, their agents, employees, representatives, and all others acting on their behalf are prohibited, enjoined, and restrained from copying plaintiffs' copyrighted works under the terms herein stated.

At the same time, the court notes the possibility that some limited or temporary use of plaintiffs' televised works might be considered fair use under the New Act, 17 U.S.C. § 107. See H.R.Rep.No.94–1476, 94th Cong., 2nd Sess., 71–72 (Sept. 3, 1976), reprinted in [1976] U.S.Code Cong. & Admin.News 5659, 5685; Rep.No.94–743, 94th Cong., 1st Sess., 66 (Nov. 20, 1975). Yet, defendants have not discussed how this type of use might be applicable to BOCES, or proposed any guidelines concerning the scope or extent of any limited temporary use, or explained its effect on plaintiffs' copyrighted works broadcast by instructional television stations.[24] Should defendants choose to consider these issues and related matters in this litigation, they may timely move the court for an order amending this injunction.

Finally, plaintiffs request the erasure of all these infringing works pursuant to 17 U.S.C. § 503. Under section 503(b), the court has discretion to "order destruction or other reasonable disposition of the articles."

Thus, as part of its final judgment or decree, the court could order the infringing article to be sold, delivered to the plaintiff, or disposed of in some other way that would avoid needless waste and best serve the ends of justice. H.R.Rep.No.94–1476, 94th Cong., 2nd Sess., 160 (Sept. 3, 1976), reprinted in [1976] U.S. Code Cong. & Admin.News 5659, 5776; Sen. Rep.No.94–473, 94th Cong., 1st Sess., 143 (Nov. 20, 1975). Considering the extensive videotape library which BOCES has developed over the years, the parties should be afforded some opportunity to meet and determine whether some type of purchasing or other agreement can be reached concerning the collection of existing works before the court orders the erasure of any infringing copies. This may avoid needless waste, and in light of this decision, serves the ends of justice. If the parties are unable to reach an agreement, plaintiffs may move for erasure of the infringing copies 30 days from this date.

So ordered.

---

**23.** Pursuant to 17 U.S.C. § 502 of the New Copyrights Act, courts have the discretionary power to grant injunctions "to prevent or stop infringements of copyright." H.R.Rep.No.94–1476, 94th Cong., 2nd Sess., 160 (Sept. 3, 1976), reprinted in [1976] U.S.Code Cong. & Admin. News, 5659, 5776; S.Rep.94–473, 94th Cong., 1st Sess., 142 (Nov. 20, 1975).

**24.** The House Report on the 1976 Copyrights Act stated:

The problem of off-the-air taping for non-profit classroom use of copyrighted audiovisual works incorporated in radio and television broadcasts has proved to be difficult to resolve. The Committee believes that the fair use doctrine has some limited application in this area, but it appears that the development of detailed guidelines will require a more thorough exploration than has so far

been possible of the needs and problems of a number of different interests affected, and of the various legal problems presented. Nothing in section 107 or elsewhere in the bill is intended to change or prejudge the law on the point. On the other hand, the Committee is sensitive to the importance of the problem, and urges the representatives of the various interests, if possible under the leadership of the Register of Copyrights, to continue their discussions actively and in a constructive spirit. If it would be helpful to a solution, the Committee is receptive to undertaking further consideration of the problem in a future Congress.

H.R.Rep.No.94–1476, 94th Cong., 2nd Sess., 71–72 (Sept. 3, 1976), reprinted in [1976] U.S. Code Cong. & Admin.News, 5659, 5685.